**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

**Case No.: 0:20-CIV-60192-AHS**

SHANE VILLARINO, *et al*.,
     Plaintiffs,

v.

PACESETTER PERSONNEL SERVICE,
INC., *et al*.,

     Defendants**.**

_____/

## DEFENDANTS' MOTION TO DECERTIFY COLLECTIVE ACTION AND INCORPORATED MEMORANDUM OF LAW

Defendants Pacesetter Personnel Service, Inc., Pacesetter Personnel Service of Florida, Inc., Florida Staffing Service, Inc., and Tampa Service Company, Inc. (collectively, "Pacesetter") bring this Motion to Decertify Collective Action and, in support thereof, state as follows:

### I.      INTRODUCTION AND SUMMARY

This case was filed by Shane Villarino, Laura J. Johnson, Jeffrey Mondy, and Jerome Gunn, ("Named Plaintiffs") individually and on behalf of other purported similarly situated persons alleging they were employed by Pacesetter and denied minimum and overtime wages in violation of the Fair Labor Standards Act ("FLSA") and the Florida Minimum Wage Act ("FMWA"), and further experienced purported violations of the Florida Labor Pool Act ("FLPA"). On March 3, 2021, the Court entered an Order that conditionally certified Plaintiffs' collective action in Fort Lauderdale for the FLSA claims. Subsequently, 322 individuals opted into the collective action ("Opt-In Plaintiffs") (together with Named Plaintiffs, "Plaintiffs"). However, as

discovery has revealed, this collective action should be decertified because the Plaintiffs are not similarly situated to one another.

Plaintiffs are not similarly situated because they reported to hundreds, if not thousands, of job sites around the Fort Lauderdale area during the statutory period. Plaintiffs reported to different site supervisors—employees of Defendant's customers, not Defendant—who implement their own policies as to the workers.

If this collective action proceeds to trial, the Court will be forced to conduct highly hundreds of factual inquiries regarding Plaintiffs' voluntary choices. For example, these individual choices would require investigations into: (i) whether each plaintiff sought work on a specific day; (ii)when each Plaintiff arrived to the labor hall; (iii)what personal pursuits Plaintiffs engaged in while waiting at the labor hall and on the job site; (iv)what transportation options Plaintiffs selected; (v)whether Plaintiffs borrowed or brought their own equipment for the day; (vi) which policies each Plaintiff was subjected to by different site supervisors; and (vii) whether each Plaintiff chose to return to the labor hall the same day to be paid.  In short, individualized questions pervade this action, resulting in 322 "mini-trials" needing to be conducted. Further, representative testimony cannot adequately account for the disparities between Plaintiffs. And computing and allocating any damages for each individual will require a complex, fact-specific, difficult, and burdensome process, which will either result in windfalls or insufficient recoveries for different Plaintiffs.

The lack of similarities between Plaintiffs and the burdensome inquiries required directly undermine the purpose of collective actions. The Court should therefore decertify the collective class and dismiss the plaintiff's claims.

## II.       PROCEDURAL BACKGROUND

Plaintiffs initiated this FLSA action on January 29, 2020, alleging Pacesetter regularly failed to pay overtime and minimum wages and uniformly denied overtime pay to its employees. [D.E.1.] Plaintiffs filed a Corrected Amended Complaint on May 6, 2020. [D.E. 152.]

On April 30, 2020, Plaintiffs filed a Motion for Conditional Certification of FLSA Collective Action (the "Motion for Conditional Certification" or "Motion"). [D.E. 151.] On March 19, 2021, the Court granted Plaintiff's Motion for Conditional Certification, but only as to workers in Fort Lauderdale, concluding "[P]laintiffs have failed to establish that there are other potential plaintiffs from locations outside of Fort Lauderdale who desire to opt in." [D.E. 256-5 at 12.] Plaintiffs then submitted a renewed motion for conditional certification on April 13, 2021, seeking to expand the putative class to Pacesetter locations nationwide. [D.E. 271-11.]  The Court denied that motion. [D.E. 499-1,4.]

To date, 322 Plaintiffs have joined this action. Pacesetter sought to depose nineteen plaintiffs, but due to numerous non-appearances by Plaintiffs, were only able to depose nine.

Pacesetter now moves to decertify the conditionally-certified collective.

## III.       FACTUAL BACKGROUND

For the sake of brevity, Pacesetter refers to, and reincorporates here, the full factual backgrounds set forth in their Response to Plaintiffs' Motion for Conditional Certification [D.E. 173] and their Response to Plaintiffs' Renewed Motion for Conditional Certification. [D.E. 290.]

### A.       Pacesetter's Business Model

Pacesetter's business model is functionally the same as other companies providing temporary manual labor to its customers: job seekers decide if, when, and for what days they wish to seek work. These temporary workers ("daily ticket workers") solely decide when, if, and for

what days they wish to seek work.[1] If daily ticket workers elect to work on a given day, they appear

at a Pacesetter labor hall location and signal that they are available for work by signing in, generally

via a keypad kiosk.[2] A daily ticket worker may then receive a job offer for that day, depending on

availability.[3] When a worker accepts Pacesetter's offer of employment, he or she is given a Daily

Time Ticket that includes the work site's location, start time, the requisite equipment, and

supervisor.[4]

      **1.**      **Plaintiffs may work for a variety of industries on any given day.**

Pacesetter's Fort Lauderdale offices, like all branch offices, serves a variety of industries.[5]

Generally, a worker will arrive at a Pacesetter branch and log-in on a keypad kiosk.[6] While workers

wait for their job assignment, many choose to engage in personal pursuits.[7]

---

[1] *See* DEFENDANT000002 at ¶ 1 ("I understand that my employment with Company is on a day to day basis. That is, at the end of the workday, I will be deemed to have quit unless and until I request and receive a work assignment at a later date.") (Employment Contract) (signed by S. Villarino on April 19, 2017); *see also* DEFENDANT0000436 at ¶ 1 (Employment Contract) (signed by L. Johnson on June 26, 2018) (same); *see* DEFENDANT000631 at ¶ 1 (signed by J. Monday October 15, 2016) (same); DEFENDANT0000923 (Employment Contract) (signed be J. Gunn on May 18, 2017) (same) (together attached as Ex. 1)

[2] [D.E. 173-19] (N. Lowe Decl. ¶ 5); [D.E. 173-20] (O. Gill Decl. ¶ 5).

[3] DEFENDANT000014 (Sign-In Policy) (signed by S. Villarino on April 19, 2017) ("I must physically report back to Pacesetter Personnel Services to make myself available to work...Daily work is available" *and* " I understand that I am an employee of Pacesetter Personnel Services on a temporary assignment...")); DEFENDANT0000448 (Sign-In Policy) (signed by Laura Johnson on June 26, 2018 (same); DEFENDANT0000642 (Sign-In Policy) (signed by Jeffrey Monday October 15, 2016) (same); DEFENDANT 000935 (Sign-In Policy) (signed by Jerome Gunn on May 18, 2017) (same) (all together attached as Ex. 2).

[4] (Daily Time Ticket of Laura Johnson, Sept. 6, 2018) (attached as Ex. 3).

[5] [D.E. 173-2] (A. Bonilla Decl. ¶ 12).

[6] [D.E. 290-6] Dave (D. Quatrino Decl. ¶ 4); [D.E. 290-7] (J. Cairel Decl. ¶ 4); [D.E. 290-8] (S. Parlante Decl. ¶ 4).

[7] [D.E. 536-2] M. Johnson Dep. Tr. at 48:22-49:1 (stating the plays on his phone and reads the news on his phone while he waits);[D.E. 536-5] K. Williams Dep. Tr. at 51:4-23 (stating while he waited, he would watch TV, drink coffee, talk, go outside to smoke a cigarette, nap, and go to the convenience store nearby to get food); [D.E. 536-1] L. Johnson Dep. Tr.  at 50:1-16 (stating while she waits, she watches TV, looks at her cell phone, sometimes chats with coworkers, and will eat a snack if she brings one); [D.E. 290-11] S. Villarino Dep. Tr.  at 89: 8-14 (Q. "Do you ever have

**2.      Pacesetter provides Plaintiffs with options on how he or she chooses to get to the assigned job site.**

Plaintiffs choose the transportation option (using Pacesetter-coordinated transportation or their own method of transportation) most convenient to them.[8] Some workers will carpool, others will take the Pacesetter van, a bus, Uber or other ridesharing company, or a combination of these.[9] Pacesetter in no way controls how a worker gets to a job site.[10] In between receipt of the Daily Time Ticket and the start of work on the job site, many daily ticket workers engage in personal pursuits before reporting to the job site.[11] Others elect to reach the jobsite early, waiting at the job site before work for the day commenced to avoid being late.[12]

---

a snack, grab a cup of coffee or eat something?" A. "Yes…Occasionally, I might have my little breakfast or something, waiting on the ticket." Q. "And do you bring breakfast with you to the office?" A. "I always do…").

[8] [D.E. 520 at 4, citing to 520-7] (Transportation Agreement) (stating that Pacesetter only provides transportations "options," and further stating that it is the daily ticket worker's responsibility to arrive on time at the job site); [D.E. 290-16] (J. Masterson Decl. ¶ 10) ("Maybe once a month I'll take my own car. I've never had a coworker ride with me.");

[9] [D.E. 290-11] S. Villarino Dep. Tr. at 43:3-4, 44:4-6 (stating that he would use the Pacesetter van, would carpool and that he has "taken a public bus to the job site"); [D.E.536-4] J. Gunn Tr. at 69:9-11, 73:23-24  (stating he occasionally drove his personal car); [D.E. 536-5] K. Williams Dep. Tr. at 32: 1-2, 33:14-19  (stating that on occasion he would drive his own without any other workers in his car).; Ex. 5, D. Charles Dep. 43:7-12 ("Q. Did the workers have a choice on which form of transportation to take? A. They could refuse the van. Q. Okay. And could they take their own form of transportation at any time? A. Yes, ma'am."); Ex. 6, M. Dowdy Dep. at 23:21-24 (stating he would wake up in the morning and "catch the bus" to the jobsite).

[10] Plaintiffs attach samples of the "Transportation Agreement" signed by every daily ticket worker prior to beginning work with Pacesetter [D.E. 520 at 4, citing to 520-7] but fail to note that the Transportation Agreement only provides transportations "options," and states that it is the daily ticket worker's responsibility to arrive on time at the job site.

[11] [D.E. 536-5] K. Williams Dep. Tr. at 52:42-53:17 ("Well, I just went straight to the job, Man. You know, I sit in my car and watch YouTube or watch me a movie or sit there right on the job in my car…watched TV on my phone until the people show up.").

[12] [D.E. 536-7]  H. Motley Dep. Tr. at 29:4-17 (stating he would sometimes get to a jobsite early, and just "stand around at the gate…or sit down…if there's something to sit on."); [D.E. 536-2] M. Johnson Dep. Tr. at 51:9-53:13 (same); [D.E. 536-5] K. Williams Dep. Tr. at 52:42-53:17 ("Well, I just went straight to the job, Man. You know, I sit in my car and watch Youtube or watch me a movie or sit there right on the job in my car…watched TV on my phone until the people show up.").

3.      **Plaintiffs report to various job sites under the supervision of customer's employees.**

At the job site, workers report to Pacesetter's customer's employee who will assign tasks, supervise their work, and provide any necessary training the workers may need.[13] At the end of the day, the customer's employee will document the worker's total hours worked for the day at the site on the worker's Daily Time Ticket.[14] The worker then reviews the hours on the Daily Time Ticket to confirm they are correct.[15]

4.      **At the end of the day, workers may choose to return to the Pacesetter branch location but are not required.**

The temporary worker's employment ends after the work for the customer is completed, and the worker no longer has any obligation to Pacesetter: workers are not required to return to Pacesetter the same day they work,[16] but some choose to return to the Pacesetter branch location

---

[13]  [D.E. 290-11] S. Villarino Dep. Tr. at 111:7-13 ("[The site supervisor will] explain to you what your job duties are. He'll explain to you what you need to do, what your time breaks are, and when to report back to get your ticket.").

[14] Ex. 7, G. Hernandez Dep. Tr. at 31:11-15 (Q. "And was it the foreman who filled out your daily time ticket?" A. "Yes. He had to sign it and put the hours in."); Ex. 5, D. Charles Dep. Tr. at 24:7-16 (stating that when the day's work is done, workers will report to the site supervisor before leaving and the supervisor will write down how many hours the workers were on the job site); Ex. 6, M. Dowdy Dep. Tr. at 26:1-4 (stating that on a job site, he would mainly report to the superintendent or whoever was in charge of filling out the Daily Time Ticket).

[15]  [D.E. 290-6] (Quatrino Decl. ¶17) ("[P]rior to payment they must confirm that the hours reflected on the ticket are correct and attest that 'I have been paid in full.' Dispatchers are required by policy to ask several questions when workers turn in their daily time tickets, including 'please confirm your hours…' If an employee identifies an error, the office will investigate by calling the site supervisor…We will correct the worker's ticket if necessary."); [D.E. 536-5] K. Williams Dep Tr. at 55:19-56:4 (stating that he would review the Daily Time Ticket for mistakes).

[16] [D.E. 290-7] (J. Cairel Decl. at ¶ 11); [D.E. 290-6] (D. Quatrino Decl. at ¶10); [D.E. 290-8] (S. Parlante Decl. at ¶ 9); [D.E. 173-2] (A. Bonilla Decl. at ¶ 11).

to get paid for the day.[17] Others may elect to return at a later date.[18] Whenever daily ticket workers choose to return to the labor hall, the workers have another opportunity to review the hours on the Daily time Ticket and dispute any errors.[19]

## IV.   MEMORANDUM OF LAW

### A.   Plaintiffs bear, and cannot meet, the heavier burden at the second stage of certification.

The FLSA authorizes collective actions against employers accused of violating the FLSA. 29 U.S.C. § 216(b). To maintain a collective action under the FLSA, both named and opt-in plaintiffs must demonstrate that they are similarly situated. *See id.* The Eleventh Circuit has adopted a two-tiered approach to certification of FLSA collective actions pursuant to 29 U.S.C. § 216(b). *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1260 (11th Cir. 2008).

---

[17] Ex. 7,  G. Hernandez Dep. Tr. at 32:18-33:9 (stating she would prefer to return to the Pacesetter Office because she wanted to get paid and she did not want to carry heavy tools back to her home and then back to Pacesetter the next day); *see e.g.,* [D.E. 290-11] S. Villarino Dep. Tr. 50:15-19 ("I was just saying, if you don't go back at the end of that day, you don't get paid. You get paid whatever day you bring back the ticket, whether it be the next day, the following day"); [D.E. 536-5] K. Williams Dep. Tr. at 60:10-11 ("Because I wanted to turn my stuff in and I want to get paid."); Ex. 8, A. Camilo Dep. Tr. at 73:7-22 (agreeing that most workers want to get paid the same day).

[18] [D.E. 290-11] S. Villarino Dep. Tr. at 52:15-18 ("There are some people that go back, like, the next day, and there are some people, don't go back two or three in a row. I guess it depends on how they feel that day."); [D.E. 536-2] M. Johnson Dep. Tr. at 70:21-71:12 (stating that, on occasion, he did not return to the Pacesetter office at the end of the day, but faced no penalty for turning in tools the next day and was paid as usual); [D.E.536-4] J. Gunn Dep. Tr. at 81:10-24; [D.E. 536-7] H. Motley Dep. at 39: 8-19 (Q. "Has there ever been a time that you did not go back to the office that night?" A. "Yes…[s]o then you're stuck with it at the office with your tool and shovel." …Q. "But the next day, you weren't docked any pay or anything, right? Right? They would pay you?" A. "No. Whatever was on the ticket, that's what you receive.").

[19] [D.E. 290-6] (Quatrino Decl. ¶17) ("[P]rior to payment they must confirm that the hours reflected on the ticket are correct and attest that 'I have been paid in full.' Dispatchers are required by policy to ask several questions when workers turn in their daily time tickets, including 'please confirm your hours…' If an employee identifies an error, the office will investigate by calling the site supervisor…We will correct the worker's ticket if necessary.").

The first determination is made at the so-called "notice stage" in which the court decides, based only on the pleadings and any affidavits, whether notice of the action should be given to potential class members. *See Hipp v. Liberty National Life Ins., Co.*, 252 F.3d 1208, 1218 (11th Cir. 2001) (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213–14 (5th Cir. 1995)). "Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class." *Id.* "If the district court 'conditionally certifies' the class, putative class members are given notice and the opportunity to 'opt-in.'" *Id.*

"The second stage is triggered by an employer's motion for decertification." *Morgan*, 551 F.3d at 1261. It is the plaintiff's burden to prove at this stage that the individual class members are similarly situated. *See Anderson v. Cagle's, Inc.,* 488 F.3d 945, 953 (11th Cir. 2007). "[U]ltimately, whether a collective action is appropriate depends largely on the factual question of whether the plaintiff employees are similarly situated to one another." *Morgan*, 551 F.3d at 1262. At the second stage, the district court has a "much thicker record than it had at the notice stage, and can therefore make a more informed factual determination of similarity." *Id.*

"This second stage is less lenient, and the plaintiff bears a heavier burden" than at the initial conditional certification stage. *Anderson*, 488 F.3d at 953 (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001)). "The similarities necessary to maintain a collective action under § 216(b) must extend 'beyond the mere facts of job duties and pay provisions.'" *Anderson*, 488 F.3d at 953 (quoting *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1314 (M.D. Ala. 2002)). "[A]s more legally significant differences appear amongst the opt-ins, the less likely it is that the group of employees is similarly situated." *Morgan*, 551 F.3d at 1261. Moreover, "the more material distinctions revealed by the evidence, the more likely the district

court is to decertify the collective action." *Anderson*, 488 F.3d at 953. Otherwise, "it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse." *Morgan*, 551 F.3d at 1261. Due to this heightened standard, "courts routinely grant motions to decertify a class after conditional certification." *Reyes v. AT&T Corp.*, 801 F. Supp. 2d 1350, 1361 (S.D. Fla. 2011).

Courts consider the following factors when evaluating whether class members are similarly situated: "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant[s] [that] appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations[.]" *Anderson*, 488 F.3d at 953 (quoting with approval *Thiessen*, 267 F.3d 1095 at 1103). These factors "are not mutually exclusive, and there is considerable overlap among them." *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 574 (E.D. La. 2008).

### 1.   Material differences in the factual and employment settings warrant decertification.

Analyzing the first factor alone shows why the plaintiffs are not similarly situated. In determining whether plaintiffs are similarly situated, courts examine a non-exhaustive list of factors including "whether plaintiffs worked in the same geographic location…whether the plaintiffs were subjected to the same policies and practices, and whether these policies and practices were established in the same manner and by the same decision maker" and "the extent to which the actions which constitute the violations claimed by Plaintiffs are similar." *Smith v. Tradesmen Intern., Inc.*, 289 F. Supp. 2d 1369, 1372 (S.D. Fla. 2003) (citing *Stone v. First Union Corp.*, 203 F.R.D. 532 (S.D. Fla. 2001)).

At the most basic level, the Plaintiffs are similar in the sense that they all were employed by Pacesetter as daily ticket workers during the statutory period. However, the similarities end there. As discussed below, the dissimilar factual and employment settings of the Plaintiffs and the

various supervisors each plaintiff had on different work sites demonstrate Plaintiffs are not similarly situated.

> a.    **The Plaintiffs experienced a wide variation in job duties on various assigned job sites around the Fort Lauderdale area.**

Each Plaintiff engaged with Pacesetter as a daily ticket worker had a unique work situation and relationship with Pacesetter, shaped primarily by the daily ticket worker's personal choices and different interactions with Pacesetter customers. *See Beecher v. Steak N Shake Operations, Inc.*, 904 F. Supp. 2d 1289, 1299 (N.D. Ga. 2012) ("Hence, just proving that all Plaintiffs and potential class members used the same reporting system and that the stores used the same internal reports, does not resolve Plaintiffs' claims or show Defendant treated Plaintiffs similarly….").

The experiences of the daily ticket workers vary by which work site they selected to work, by customer, and the personal preferences of each individual Plaintiff, rendering them not similarly situated. To begin with, Plaintiffs worked at a variety of job sites in the Fort Lauderdale area performing various types of work.[20] Site supervisors—employees of Pacesetter's customers, not

---

[20][D.E. 536-7] H. Motley Dep. Tr. 18:10-21:14 (stating he has possibly worked at more than a hundred job sites doing general labor such as setting up offices, unloading trucks, construction site clean-up, also event set-up or "housekeeping" at Dolphin Stadium or Hard Rock Stadium); Ex. 6, M. Dowdy Dep. Tr.at 19:9-21 (stating he worked at various job sites that included hospitals, construction of new condos and townhomes, and at the stadium doing a variety of tasks such as sweeping and general clean-up); [D.E. 536-2] M. Johnson Dep. Tr. at 38:20-42:24 (stating he has worked on various construction sites for condos, hospitals, government buildings, hotels, road construction doing a variety of tasks including sweeping, taking out the trash, pressure cleaning, event set-up, landscaping, flagging, packaging, painting, and moving); [D.E.536-4] J. Gunn Dep. Tr. at 45:16-22 (stating he could have worked at a different site every day of the week); Ex. 7, G. Hernandez Dep. Tr. at 18:11-15 ([She performed] "[c]leaning, sweeping up, picking up, garbage, debris, inside, outside, interior work and exterior work."); Ex. 4, J. Osorio Dep. Tr. at 18:5-13 (stating he did general labor, which included sweeping, removing trash, but that "it was never the same thing….it was always something different.").

Pacesetter—write down the hours worked on the daily time ticket.[21] Breaks are at the discretion of the site supervisor, who is not an employee of Pacesetter.[22]

The tasks completed by each Plaintiff depend on the assigned job site, of which there are the thousands.[23]

> **b.      Plaintiffs were not subjected to a common timekeeping scheme that artificially understated their hours. Instead, Pacesetter's customers recorded Plaintiffs' hours—not Pacesetter.**

Decertification is appropriate where any "undercompensation was not suffered on a collective basis—i.e., according to a 'single decision, policy, or plan' applicable to all plaintiffs—but rather…defendant's policies and practices impacted individual plaintiffs in individual ways." *Lugo v. Farmer's Pride Inc.*, 737 F. Supp. 2d 291, 303 (E.D. Pa. 2010) (citing *Fox v. Tyson Foods,*

---

[21] Ex. 5,  D. Charles Dep. Tr. at 24:7-16 (stating that when the day's work is done, workers will report to the site supervisor before leaving and the supervisor will write down how many hours the workers were on the job site); Ex. 6, M. Dowdy Dep. Tr. at 26:1-4 (stating that on a job site, he would mainly report to the superintendent unless someone else was specifically in charge to take labor forms); [D.E. 536-5] K. Williams Dep. Tr. at 54:12-23 (stating that when he reports to the job site, he turns the daily time ticket into the person that is named on the ticket, who writes down the hours and signs them at the end of the day); [D.E. 536-7] H. Motley Dep Tr. 37:13-22 (Q. "So who writes down how many hours you work at the jobsite?" A." The labor foreman." A. "Okay. And that's not a Pacesetter employee, right?" A. "Correct" Q. "Do they ever—In your personal experience have they ever written down the wrong number?" A. "Ah, no, I can't say that's happened."); [D.E. 536-2] M. Johnson Dep. Tr. at 65:11-17 (A. "That was a time I worked six months, 12 hours a day, seven days a week." Q. "Okay. Why did they put down lunch 30 minutes if you weren't taking lunch?" A. "That's what he chose to do. You will have to ask [the site supervisor] that.").

[22] [D.E. 536-7] H. Motley Dep. Tr. at 36:10-37:12 (stating that the labor foreman is the one who decides the breaks workers get, which usually were in the morning and at lunch); Ex. 6, M. Dowdy Dep. Tr. at 27:12-13 (Q. "Who decided what breaks you got?" A. "The superintendent or the labor foreman.").

[23] [D.E. 536-2] M. Johnson Dep. Tr. at 38: 6-16 (Q. "Mr. Johnson, how many different work sites would you say you've worked on in that time?" A. "Hundreds."[…] Q. "Okay. Is it more than 200?" A. "Probably more." Q. "More than 300?" A. "Around that. I have been to a lot of job sites."); [D.E.536-4] J. Gunn Dep. Tr. at 45:16-22 (stating that he could have worked at more than one site in a given week, and could have also worked on a different site every day of the week); Ex. 4,  J. Osorio Dep. Tr. at 17:1-6 ("Honestly, I—I can't [provide an estimate of how many jobsites I worked on]. There were so many that I can't—really tell you, honestly.").

*Inc.*, CIV. A. No. 99-1612, 2006 WL 6012784, at *6 (N.D. Ala. Nov 15, 2006)). Collective adjudication is impermissible where, as here, plaintiffs cannot proffer substantial evidence of a common policy, plan, or decision by the defendants to violate the FLSA. *See Whineglass v. Smith*, No. 8:11-CV-2784-T-23TGW, 2013 WL 2237841, at *8–9 (M.D. Fla. May 21, 2013); *see also Briggins v. Elwood Tri, Inc.*, 882 F. Supp. 2d 1256, 1273 (N.D. Ala. 2012) (denying collection action because there was no common policy, plan, or decision to work employees off the clock). Whether plaintiffs are subject to the same decision maker can be definitive in determining whether plaintiffs are similarly situated. *See Laos v. Grand Prize Motors, Inc.* No-11-CIV-22973, 2021 WL 718713, at *3 (S.D. Fla. Mar. 6, 2012). Even where job duties are similar, other factual differences in employment may mean that plaintiffs are not similarly situated. *Rodriguez v. Niagara Cleaning Services*, No. 09-22645-CIV, 2010 WL 11505505, at *4-5 (S.D. Fla. Dec. 14, 2010) (finding that different work sites prevented a finding that plaintiffs were similarly situated).

Critically, the 322 Plaintiffs here worked in *different* positions at *different* work sites under *different* "policies" implemented by *different* work site managers.[24]

> **i.**    **Plaintiffs were not subjected to a common scheme or policy of paycheck deductions for equipment and transportation.**

---

[24][D.E. 536-7] H. Motley Dep Tr. at 37: 24-38:2 (stating sometimes he has been given an extra hour on his daily time ticket by the foreman because he did a good job that day); Ex. 4,  J. Osorio Dep. Tr. at 24:1-8 (stating that what happened after the workers arrival varied, "depending on what the foreman would want"); [D.E.536-4] J. Gunn. Dep. Tr. at 61:1-18 (stating that the foreman put that worked time started at 6, even though Mr. Gunn arrived at 7, because "[the supervisor] can put whatever he want to put on it, basically");[D.E. 536-5] K. Williams Dep. Tr. at 56:13-19 (stating that some supervisors would credit lunch as an hour worked, not as a break).

Here, there is no common policy or scheme permitting or requiring paycheck deductions for more than \$3.00 per day for transportation[25] or for equipment rental.[26] Further, not all plaintiffs were subject to the permissible \$3.00 per day deduction for transportation.[27] Pacesetter-coordinated transportation was voluntary, and many plaintiffs did not participate.[28] Similarly, there was no policy permitting charges for equipment rental, and any equipment deductions that were incurred were for failure to return equipment, or for voluntary equipment purchase.[29]

---

[25] [D.E.536-9] (M. Plotkin Decl. at ¶ 6).

[26] [D.E. 290-7] (Cairel Decl. ¶ 21); [D.E. 290-6] (Quatrino Decl. ¶ 20); [D.E. 290-8] (Parlante Decl. ¶ 17) ("There is no policy that permits renting equipment. That would be a bookkeeping nightmare.").

[27] [D.E. 536-5] K. Williams Dep. at 34:16-22 (Q. "When you took the Pacesetter van or rode with a coworker or took the bus or an Uber, were you ever charged more than \$3 for that?... A. "No, no, no no, it was always \$3. Yeah, it was always \$3."); [D.E. 290-11] S. Villarino Dep. Tr. at 43:16-19 (Q. "Were you ever charged more than \$3 for transportation in a single day?" A. "Not that I can recall…not that I recall right now—I wasn't."); [D.E. 536-1] L. Johnson Dep. Tr. at 31:10-12 (Q. "And were you ever charged more than \$3 for transportation in a single day?" A. "No."); [D.E. 536-2] M. Johnson Dep. Tr. 57:17-19 (Q. "All right. Have you ever been charged more than 1.50 on the way and 1.50 on the way back?" A "No."); [D.E. 536-7] H. Motley Dep. at. 34:20-22 (Q. "Have they ever charged you even more than three dollars for a day's transportation?" A. "No."). [D.E.536-4] J. Gunn Dep. Tr. at 37:2 - 37:4 ("Q. Okay. So they never overcharged you for transportation; is that correct? A. Correct."). Later, Gunn did testify that "they probably" "one day charged [him] for both the Uber and the van, but that it did not happen more than "one or two times."; [D.E.536-4] J. Gunn Depo. Tr. at 72:3-17; Ex. 6, M. Dowdy Dep. at 18:8-20 (A. "In some cases I was charged over \$3 a ride." […] Q. "How many times did that happen?" A. Several times." Q. "Was it more than five times or less?" A. "I would say more than five times.").

[28] Ex. 5, D. Charles Dep. 43:7-12 ("Q. Did the workers have a choice on which form of transportation to take? A. They could refuse the van. Q. Okay. And could they take their own form of transportation at any time? A. Yes, ma'am."); [D.E.536-4] J. Gunn Tr. at 69:9-11, 73:23-24 (stating he occasionally drove his personal car); [D.E. 536-5] K. Williams Dep. Tr. at 32: 1-2, 33:14-19  (stating that on occasion he would drive his own without any other workers in his car).

[29] Ex. 5, D. Charles Dep. 25:25-26:3 ("Q. And if for some reason someone doesn't bring back a tool, they might be charged for not bringing that tool back, correct? A. Correct."); [D.E.536-9] (M. Plotkin Decl. at ¶ 11); [D.E.536-4] J. Gunn Dep. Tr. at 67:24-68:2 (Q. "But they won't charge you just for taking the shovel for the day; right? As long as you return it?" A. "Yeah. As long as you return it."); [D.E. 536-2] M. Johnson Dep. Tr. at 57:1-2 ("Q. "Were you charged for any equipment?" A. "I wasn't charged for equipment."); [D.E. 290-11] S. Villarino Dep. Tr. at 54: (Q. "But you, yourself, have never been charged for equipment?" A. "I have not—again, that I recall, I, myself, have never been charged with equipment…"); [D.E.536-4] J. Gunn Dep. Tr. at 67:12-14 (Q. "Has anyone at Pacesetter ever told you that there's a rental fee for equipment?" A. "Rental

Pacesetter provides daily ticket workers a chance to contest any inaccuracies they may discover on their daily time ticket, and many have done so successfully.[30] In fact, Pacesetter provides at least *three* opportunities for workers to contest hours worked: at the job site, at the individual Pacesetter branch office that dispatched them, and via a provided phone number to corporate headquarters.[31]

As a matter of policy, Pacesetter will investigate and adjust hours where appropriate,[32] often erring on the side of believing the worker and at times paying the difference at Pacesetter's expense.[33] In the event daily ticket workers are dissatisfied with the outcome of a review of their daily ticket hours, they are provided with Pacesetter's Human Resources Department's phone number if they wish to further contest their hours, which on occasion they do.[34]

---

fee? No. They never told me that."); [D.E. 536-7] H. Motley Dep. at 34: 6-10; Ex. 7, G. Hernandez Dep. Tr.at 28:5-7 ("If you leave [the equipment], lose it, break it, whatever, if you don't come back with it, you're charged.").

[30] [D.E. 290-6] (D. Quatrino Decl. ¶17) ("[P]rior to payment they must confirm that the hours reflected on the ticket are correct and attest that 'I have been paid in full.' Dispatchers are required by policy to ask several questions when workers turn in their daily time tickets, including 'please confirm your hours…' If an employee identifies an error, the office will investigate by calling the site supervisor…We will correct the worker's ticket if necessary."); [D.E. 536-5] K. Williams Dep Tr. at 55:19-56:4 (stating that if there was a mistake on the daily time ticket that was not caught by him until he got back to the Pacesetter office, the Pacesetter staff would get it corrected).

[31] [D.E. 536-9] (Plotkin Decl. ¶ 10); [D.E. 173-3] (Decl. of Gracie Hernandez at ¶ 5).

[32] [D.E. 290-6] D. Quatrino Decl. ¶ 17 ("If an employee identifies an error, the office will investigate by calling the site supervisor and getting a copy of the supervisor's ticket."); [D.E. 290-7] (J. Cairel Decl. ¶ 19); [D.E. 290-8] (S. Parlante Decl. ¶ 15) ("Pacesetter will make any necessary revisions to ensure that the daily ticket reflects all of the hours the employee worked.").

[33] [D.E. 290-7] ( J. Cairel Decl., ¶ 19) ("If the supervisors won't admit a mistake, we'll just pay the worker anyway and Pacesetter will eat the cost difference."); [D.E. 290-8] (S. Parlante Decl. ¶ 15) ("Pacesetter will make any necessary revisions to ensure that the daily ticket reflects all of the hours the employee worked. Pacesetter errs on the side of believing the daily ticket worker, and will at times pay the difference at Pacesetter's cost. With Covid, we've lost a lot of our regular workers, so we don't want to alienate workers. We need them."); [D.E. 173-2] (A. Bonilla Decl. ¶ 14) (same).

[34] [D.E. 173-3](Decl. of Gracie Hernandez at ¶ 5).

For all of these reasons, Plaintiffs have "failed to show Plaintiffs and potential class members are similarly situated" because they "fail[] to identify a nationwide policy or commonality among the proposed class members." *Beecher,* 904 F. Supp. 2d at 1299. This failure to identify a common policy can cause "resulting litigation [to] become easily unmanageable," due to the class size and lack of cohesion among the claims." *Id*.

### 2.    The Plaintiffs are Subject to Individualized Defenses.

The second factor of the decertification analysis, the existence of individualized defenses, likewise supports decertification. *See Anderson*, 488 F.3d at 953. Decertification is proper when a defendant's defenses are specific to each plaintiff and cannot be applied to the class as a whole. *Id.* at 954 n.8. At the second stage, "the district court must consider whether the defenses that apply to the opt-in plaintiff's claims are similar to one another or whether they vary significantly." *Morgan*, 551 F.3d at 1262. "[T]he availability of defenses to some but not all of the putative class members 'clearly poses significant case management concerns.'" *Anderson*, 488 F.3d at 954 n.8. Where, as here, there are individualized defenses "a one-size-fits-all determination is impossible" and a representative class is unmanageable. *Briggins*, 882 F. Supp. 2d at 1263; *see also Frye v. Baptist Mem'l Hosp.*, No. CIV. 07-2708, 2010 WL 3862591, at *8 (W.D. Tenn. Sept. 27, 2010) ("The presence of many individualized defenses makes a representative class unmanageable," and warrants decertification).

Here, Plaintiffs' claims that time spent waiting and travelling is compensable will require individualized examination of: (i) how each plaintiff spent their waiting time; (*see, e.g.*, *Skidmore v. Swift & Co.,* 323 U.S. 134, 162, 65 S. Ct. 161, 164, 89 L. Ed. 124 (1944) (finding that waiting time spent "in sleep or in amusement as they saw fit" was not compensable); *Birdwell v. City of Gadsden, Ala*., 970 F.2d 802, 810 (11th Cir. 1992) ("The question of whether the employees are

working during this time for purposes of the FLSA depends on the degree to which the employee may use the time for personal activities."); (ii) whether activities such as collecting tools was "integral and indispensable" to a "principal activity" (*see e.g.*, *IBP, Inc. v. Alvarez*, 546 U.S. 21, 40–41, 126 S.Ct. 514, 527, 163 L.Ed. 2d 288 (2005) and *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1344 (11th Cir. 2007)); and (iii) whether such activities were for the worker's benefits and/or merely logistical (*see Smith v. Aztec Well Servicing Co.,* 462 F.3d 1274, 1288 (10th Cir. 2006) (finding that travelling time was not compensable where "the plaintiffs were required to travel together for reasons related to the logistics of commuting rather than anything integral and indispensable to their principal activities.") and *Bernal v. Trueblue, Inc*., 730 F. Supp. 2d 736, 744 (W.D. Mich. 2010)). For these reasons alone, the compensability of time spent waiting, being transported, and checking out and/or returning tools is not a common question of fact, but rather will turn on a myriad of individualized examinations and defenses.

Specifically, decisions on the compensability of waiting and travel time are not possible on a collective basis because it would require the Court to examine how each worker spent their waiting time, whether such activities were "integral and indispensable" to the work to be performed, and whether waiting and transportation was for the worker's benefit or the employers. *See Rindfleisch v. Gentiva Health Services, Inc.*, 22 F. Supp. 3d 1295, 1303-04. (N.D. Ga. 2014) (decertifying a class of home-healthcare clinicians who were paid flat rates for in-home visits partly because "individual determinations regarding liability must be made").

Plaintiffs' claims further necessitate factually intensive and highly individualized inquiries on regarding 322 Plaintiffs' voluntary choices, including what time workers reported to the

Pacesetter office. As arrival time was discretionary, there are a wide range of arrival times.[35]

Workers may also choose not to report to the labor hall some days.[36] Further, Plaintiffs' waiting

time may be spent by the workers on personal pursuits.[37] Compounding these factually driven

inquiries further, individual determinations would need to be made on whether workers borrowed

required equipment from Pacesetter and whether this equipment was returned, as many Plaintiffs

outwardly deny they were ever charged.[38] There was no policy permitting charges for equipment

---

[35] [D.E. 536-1] L. Johnson Dep. Tr. at 44:19-45:5 (stating that she generally arrives at the Pacesetter office at 4:30 a.m.); [D.E. 536-2] M. Johnson Dep. Tr.at 44: 15 ("I'll be there between 4:00 o'clock, 4:00 and 5:30"); [D.E. 290-11] S. Villarino Dep. Tr. at 85:1-5 ("I will get there normally at 6…no later than 6:15");  [D.E.536-4] J. Gunn Dep. Tr. at 51:1-12 (he arrived at the office at varying times including 4:30, 5:00, 5:30, and 6:00); [D.E. 536-5] K. Williams Dep. Tr. at 47:7-16 (he normally arrived at the office between 5:00 and 5:45); [D.E. 536-7] H. Motley Dep. Tr. At 24:25-25:9 (stating he would generally arrive between 5:30 a.m. and 6 a.m. and occasionally at 6:30 a.m. if he had a repeat ticket).

[36] [D.E. 536-2] M. Johnson Dep. Tr. 43:5-15 (stating that the days he worked change from week to week and "then if I want to take a break on Wednesday, I take a break."); [D.E. 536-5] K. Williams Dep. Tr. 46:12-14 (stating that Pacesetter did not tell him what days to work); [D.E. 536-1] L. Johnson Dep. Tr. at 57: 17-23 (at times she would take the public bus from the bus stop closest to her home directly to the work site); [D.E. 536-5] K. Williams Dep. Tr. at 45:22-46:3 (stating he would go to the labor hall most days, but sometimes he would not when "he had something to do" or when he had to "go to a doctor's appointment, or do something …concerning on of [his] kids."); Ex. 6 (M. Dowdy Dep. Tr. at 20:16-23) (stating he would generally not work on the weekends).

[37]  [D.E. 536-2] M. Johnson Dep. Tr. at 48:22-49:1 (stating he plays on his phone and reads the news on his phone, while he waits); [D.E. 536-5] K. Williams Dep. Tr. at 51:4-23 (stating while he waited, he would watch TV, drink coffee, talk, go outside to smoke a cigarette, nap, and go to the convenience store nearby to get food); [D.E. 536-1] L. Johnson Dep. Tr. at 50:1-16 (stating while she waits, she watches TV, looks at her cell phone, sometimes chats with coworkers, and will eat a snack if she brings one); [D.E. 290-11] S. Villarino Dep. Tr. at 89: 8-14 (Q. Do you ever have a snack, grab a cup of coffee or eat something?" A. "Yes…Occasionally, I might have my little breakfast or something, waiting on the ticket." Q. "And do you bring breakfast with you to the office?" A. "I always do…"); [D.E. 536-7] H. Motley Dep. at 27:5-7, 27:24-28:3 (stating "[workers] were just watching television, or standing outside maybe, smoking a cigarette" and that he would watch Fox News on his phone while he waited for his daily time ticket).

[38][D.E. 536-2] M. Johnson Dep. Tr. 57:1-2 (Q. "Were you charged for any equipment?" A. "I wasn't charged for equipment."); [D.E. 290-11] S. Villarino Dep. Tr. 106:14-16 (Q. "Mr. Villarino, have you ever been charged a rental feel for equipment?" A. "Myself has never been charged; no, ma'am. Not that I know of."); [D.E. 173-15] (J. Stewart Decl. ¶ 6 ); [D.E. 173-19] (N. Lowe Decl.

rental, and any equipment deductions that were incurred were for failure to return equipment or for voluntary equipment purchase.[39] Moreover, transportation inquiries are not a common question of fact, as Plaintiffs were not required to take Pacesetter provided transportation,[40] and many putative plaintiffs explicitly deny that they were charged in excess of $3.00 per day for

---

¶ 7 ("I have never been charged a 'rental fee' for this equipment.") [D.E. 173-20 (O. Gill Decl. ¶ 7) (same); [D.E. 536-7] H. Motley Dep. at 34: 6-10.

[39] Ex. 6, D. Charles Dep. 25:25-26:3 ("Q. And if for some reason someone doesn't bring back a tool, they might be charged for not bringing that tool back, correct? A. Correct."; [D.E.536-9] (M. Plotkin Decl. at ¶ 11); [D.E.536-4] J. Gunn Dep. Tr. at 67:24-68:2 (Q. "But they won't charge you just for taking the shovel for the day; right? As long as you return it?" A. "Yeah. As long as you return it."); [D.E. 536-2] M. Johnson Dep. Tr. at 57:1-2 ("Q. "Were you charged for any equipment?" A. "I wasn't charged for equipment."); [D.E. 290-11] S. Villarino Dep. Tr. at 54: (Q. "But you, yourself, have never been charged for equipment?" A. "I have not—again, that I recall, I, myself, have never been charged with equipment…"); [D.E.536-4] J. Gunn Dep. Tr. at 67:12-14 (Q. "Has anyone at Pacesetter ever told you that there's a rental fee for equipment?" A. "Rental fee? No. They never told me that."); [D.E. 536-7] H. Motley Dep. at 34: 6-10.

[40][D.E. 290-11]  S. Villarino Dep. Tr. at 43:3-4, 44:4-6 (stating that he would use the Pacesetter van, would carpool and that he has "taken a public bus to the job site"); [D.E.536-4] J. Gunn Tr. at 69:9-11, 73:23-24  (stating he occasionally drove his personal car);  [D.E. 536-5] K. Williams Dep. Tr. at 32: 1-2, 33:14-19  (stating that on occasion he would drive his own without any other workers in his car).

transportation.[41] Workers are not required to return to the Pacesetter office at the of the day,[42] but many elect to because they wish to be paid the same day.[43] Some workers chose to return the following day.[44] In short, these variations will require a myriad of individualized examinations,

---

[41] K. William Dep. Tr. 34: 13-22 (Q. "Were you ever charged more than $3 per day for transportation?" A. "'No, no, no, no, it was always $3. Yeah, it was always $3"); Johnson Dep. Tr. at 31:10 - 31:12 (Question: "And were you ever charged more than $3 for transportation in a single day?" Answer: "No."); [D.E. 290-11] S.Villarino Dep. Tr. at 43:16 - 43:19 (Question: "Were you ever charged more than $3 for transportation in a single day? Answer: "Not that I can recall. No, ma'am; not that I recall right now I wasn't."); [D.E.536-4] J. Gunn Dep. Tr. at 36:4 - 36:6 (stating that Pacesetter "never overcharged [him] for transportation."); [D.E. 536-2] M. Johnson Dep. Tr. 57:17-19 (Q. "All right. Have you ever been charged more than 1.50 on the way and 1.50 on the way back?" A. "No."); [D.E. 536-7] H. Motley Dep. at 34:20-22 (Q. "Have they ever charged you even more than three dollars for a day's transportation?" A. "No."). Some Plaintiffs chose to purchase bus passes from Pacesetter for their personal use. *See* [D.E.536-9] (M. Plotkin Decl. at ¶ 6) ("Daily ticket workers at some Florida offices may elect to purchase unlimited all-day bus passes for $3.00 for their personal use. These bus passes may be used for multiple rides on any one day, and may be used on a different day than purchased. Broward County bus passes cost $5.00, but Pacesetter provides them at a loss for $3.00 each. Daily ticket workers may purchase multiple bus tickets at once."); D.E. 173-14] (J. Stanley Decl. at ¶ 3) ("They charge me for the bus pass, only $3, but it's normally $5, so that's below the rate of the bus line, which is really nice in my book.").

[42] [D.E. 290-7] (J. Cairel Decl. at ¶ 11); [D.E. 290-6] (D. Quatrino Decl. at ¶10); [D.E. 290-8] (S. Parlante Decl. at ¶ 9); [D.E. 173-2] (A. Bonilla Decl. at ¶ 11).

[43] *See e.g.,* [D.E. 290-11] S. Villarino Dep. Tr. 50:15-19 ("I was just saying, if you don't go back at the end of that day, you don't get paid. You get paid whatever day you bring back the ticket, whether it be the next day, the following day"); [D.E. 536-5] K. Williams Dep. Tr. at 60:10-11 ("Because I wanted to turn my stuff in and I want to get paid.").

[44] [D.E. 536-2] M. Johnson Dep. Tr. at 70:21-71:12 (stating that, on occasion, he did not return to the Pacesetter office at the end of the day, but faced no penalty for turning in tools the next day and was paid as usual); [D.E.536-4] J. Gunn Dep. Tr. at 81:10-24 (same *See e.g.* [D.E. 290-11]*,* S. Villarino Dep. Tr. 50:15-19 ("I was just saying, if you don't go back at the end of that day, you don't get paid. You get paid whatever day you bring back the ticket, whether it be the next day, the following day"); [D.E. 536-5] K. Williams Dep. Tr. at 60:10-11 ("Because I wanted to turn my stuff in and I want to get paid."); [D.E. 536-7] H. Motley Dep. at 39: 8-19 (Q. "Has there ever been a time that you did not go back to the office that night?" A. "Yes…[s]o then you're stuck with it at the office with your tool and shovel." …Q. "But the next day, you weren't docked any pay or anything, right? Right? They would pay you?" A. "No. Whatever was on the ticket, that's what you receive.")

making "a one-size-fits-all determination is impossible" and a representative class unmanageable. *Briggins*, 882 F. Supp. 2d at 1263.

### 3. Fairness and Procedural Concerns Support Decertification.

Lastly, decertification is further warranted here due to fairness and procedural considerations. While the main purposes of FLSA class actions are: "(1) reducing the burden on plaintiffs through the pooling of resources, and (2) efficiently resolving common issues of law and fact that arise from the same illegal conduct," this efficiency cannot come at the expense of a defendant's ability to fairly litigate a case. *Morgan*, 551 F.3d at 1264; *Knott v. Dollar Tree Stores, Inc.*, 897 F. Supp. 2d 1230, 1241 (N.D. Ala. 2012). (granting decertification because individualized defenses presented "an extensively fact-based inquiry," and therefore "[i]t would be fundamentally unfair to Dollar Tree if the class were to remain certified").

For this inquiry, which is separate from determining the similarly situated issue, courts must "balance these putative benefits against any prejudice to the defendant and any judicial inefficiencies that may result from allowing plaintiffs to proceed collectively." *Id.* (quoting *Bayles v. American Medical Response of Colorado, Inc.*, 950 F. Supp. 1053, 1067 (D. Colo. 1996)). The Court also must consider "whether it can coherently manage the class in a manner that will not prejudice any party." *Briggins,* 882 F. Supp. 2d at 1263. Additionally, courts must be "particularly mindful of the burden that a collective action imposes on a jury." *Johnson*, 561 F. Supp. 2d at 588.

### a. Individualized questions pervade this litigation.

Here, manageability and fairness considerations also favor decertification. The determinations at issue in this case all require an inquiry into each plaintiff's individual claim for unpaid minimum and overtime wages. Mini-trial inquiries needed to resolve plaintiff's claims render collective treatment inappropriate because "where there are significant differences in

employment experiences…the procedural advantages of a collective action evaporate, and the Court's confidence that a just verdict on the merits can be rendered is seriously undermined." *Johnson*, 561 F. Supp. 2d at 587-88.  "[T]here is simply a realistic limit on what a jury may reasonably be expected to absorb, retain, and process." *Gatewood v. Koch Foods of Mississippi, LLC,* No. 3:07CV82-KS-MTP, 2009 WL 8642001, at *1 (S.D. Miss. Oct. 20, 2009) (citing *Thiessen,* 996 F. Supp at 1084); *see also Bayless*, 950, F. Supp. 2d at 1067.

    As in *Proctor*, decertification is warranted for case management and procedural concerns where, as here, "there is no consistency among the testimony, there is no consistently applied policy resulting in working off the clock, and the time spent working off the clock is not alleged to be uniform or of a predetermined duration." *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 284 (N.D. Tex. 2008).

    Fairness and procedural concerns raised by the defendants concerning factual allegations of hundreds of plaintiffs for unpaid overtime favors decertification, in light the highly individualized factual findings of each individual plaintiff's differing start times. *See Briggins,* 882 F. Supp. 2d at 1279 (finding proceeding on a gap time analysis—which assumed *all* plaintiffs started work from the moment they scanned in for purposes of calculation—would be highly prejudicial to the defendants).

    As noted in *Mathis v. Darden Restaurants*, No. 12-61742-CIV, 2014 WL 4428171, at *5 (S.D. Fla. Sept. 1, 2014), "a collective action no longer poses benefits in terms of manageability or fairness and is not preferable to individual actions spread across the appropriate federal venues nationwide…" when a court would be "forced to utilize numerous subclasses, individualized evidence, individualized liability determinations, and individualizes damage determinations." *Id.* (favoring decertification when individualized defenses "that specific class members did not work-

off-the-clock, received managerial instructions…directly contrary to well-established policy and practice…and unreasonably failed to avail themselves of curative steps provided by the employer to recover unpaid compensation" were available to defendants); *see also Epps v. Oak St. Mortg. LLC*, No. 5:04-CV-46-OC-10GRJ, 2006 WL 1460273, at *7 (M.D. Fla. May 22, 2006) (stating resolution of claims would involve an individualized level of inquiring on "how or whether each individual manager implemented the policy with regard to each individual plaintiff" which would only be "further complicated by various defenses that [defendant] is entitled to raise, which will require highly individualized evidence.").

With the addition of each plaintiff comes the introduction of new questions, including when each plaintiff arrived in the morning, how each worker spent their waiting time, whether they received equipment that was "necessary for the job"; whether they were charged for equipment rental; whether they elected to take Pacesetter-provided transportation; and if they were ever charged more than $3.00 per day for transportation (and whether the worker can prove that). These questions will result in 322 individual mini-trials being conducted, rather than one collective adjudication.

> **b.      The result of using representative evidence would be an impermissible "all or nothing" determination.**

Due to the large number of Plaintiffs, the parties will be forced to use representative evidence at trial—which will unduly prejudice Pacesetter, who will face an inequitable all-or-nothing determination as to liability.

Collective adjudication is inappropriate when "defendants would face all-or-nothing liability for a large group of employees, despite those employees' dissimilar working conditions." *Mathis*, 2014 WL 4428171, at *5. Like the defendants in *Mathis*, Pacesetter here faces the reality that individual plaintiffs would not receive recoveries based on their individual experiences, rather

"they would…be grouped with other Opt-In Plaintiffs and receive either windfalls or insufficient recoveries." *Id*. Nine deposed Plaintiffs out of 322 Plaintiffs cannot be representative of the class, especially in light of highly individualized determinations that must be made. *See King v. CVS/Caremark Corp.*, No.07-21824-CIV, 2008 WL 5973490, at *6 (S.D. Fla. Sept. 11, 2008) ("[T]he Court is not persuaded that representative testimony would be appropriate based on the variation in stores, management practices and factual disparaties as to each Plaintiff."); *see also Roberson v. Restaurant Delivery Developers, LLC*, 320 F. Supp. 3d 1309, 1320-21 (M.D. Fla. 2018) (finding decertification was warranted due to the individualized nature of the inquiries for various delivery companies across multiple states because "damages for non-existent work hours could be awarded to plaintiffs not aggrieved, or smaller amounts of damages could be award to plaintiffs than what was truly owed."); *Rindfleisch*, 22 F. Supp. 3d at 1304 ("The Court cannot determine a proper amount of overtime damages if this matter proceeds as a collective action when a number of [p]laintiffs did not actually work overtime while employed by [defendant]… representative testimony regarding hours worked to determine an amount of damages is inappropriate when the issue of liability... is still in question in regards to certain Plaintiffs.").

Plaintiffs have shown no method for allocating damages among the putative plaintiffs based on their individual fact-specific claims. Additionally, while Pacesetter continues to deny any wrongdoing whatsoever, the potential for windfalls exists and some plaintiffs that were actually aggrieved (and, again, Pacesetter denies that any have) might recover insufficient amounts if they were incorrectly charged for transportation and equipment because of the inability to identify the truly aggrieved versus those who were merely charged, at their election, for bus passes or equipment purchases.

Similarly, representative testimony does not properly represent the variety of Plaintiffs' experiences in regards to hours spent waiting and traveling because Plaintiffs are not required to report to the labor hall in the morning,[45] nor are they required to take Pacesetter-coordinated transportation.[46] Computing and allocating any damages for each individual will require a complex, fact-specific, difficult, and burdensome process. This is exactly what collective adjudication is intended to avoid.

## CONCLUSION

As detailed in the previous sections, the different factual and employment settings, as well as the various defenses applied to the plaintiffs, make this collective action unmanageable and procedurally impractical and unfair.  Each of the three factors weigh in favor of decertification. Therefore, this collective action should be decertified because of the differences and distinct defenses of the plaintiffs, as well as the procedural unfairness and unmanageability.

WHEREFORE, Pacesetter respectfully requests that this Court enter an order: (1) decertifying this collective action; and (2) granting such other and further relief as the Court deems just and proper.

---

[45] [D.E. 536-2] M.  Johnson Dep. Tr. 43:5-15 (stating that the days he worked change from week to week and "then if I want to take a break on Wednesday, I take a break."); [D.E. 536-5]  K. Williams Dep. Tr. 46:12-14 (stating that Pacesetter did not tell him what days to work).

[46] [D.E. 290-11] S. Villarino Dep. Tr. at 43:3-4, 44:4-6 (stating that he would use the Pacesetter van, would carpool and that he has "taken a public bus to the job site"); [D.E.536-4] J. Gunn Tr. at 69:9-11, 73:23-24  (stating he occasionally drove his personal car); [D.E. 536-5]  K. Williams Dep. Tr. at 32: 1-2, 33:14-19  (stating that on occasion he would drive his own without any other workers in his car).

Dated: March 7, 2022

Respectfully Submitted,

By: *s/ Ronald J. Tomassi, Jr.*

Ronald J. Tomassi, Jr.
  Florida Bar No. 29751
Derek E. León
  Florida Bar No. 625507
**LEÓN COSGROVE, LLP**
255 Alhambra Circle, Suite 800
Coral Gables, Florida 33134
Telephone: 305-740-1975
Email: dleon@leoncosgrove.com
Email: rtomassi@leoncosgrove.com

Joel M. Androphy, Esq.
Caroline K. Gorman, Esq.
**BERG & ANDROPHY**
3704 Travis Street
Houston, Texas 77002
Telephone: 713-529-5622
Email: jandrophy@bafirm.com
Email: cgorman@bafirm.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 7, 2022, I electronically filed the foregoing with the

Clerk of the Court with a copy of the same to be served upon counsel via the CM/ECF system:

Dion J. Cassata, Esq.
**CASSATA LAW, PLLC**
Boca Crown Centre
7999 North Federal Highway, Suite 202
Boca Raton, Florida 33487
Email: dion@cassatalaw.com
Phone: 954-364-7803

Andrew R. Frisch, Esq.
**MORGAN & MORGAN, P.A.**
8151 Peters Road, 4th Floor
Plantation, FL 33324
Email: dion@cassatalaw.com
Phone: 954-967-5377

By: *s/ Ronald J. Tomassi, Jr.*
Ronald J. Tomassi, Jr.